FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA AUG -3
### MIDDLE DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| NANCY BARRON, | ) |
| Plaintiff, | ) |
| vs. | ) CV 00-PT-0931-M |
| WOMEN'S HEALTH CARE PROFESSIONALS, INC., | ) |
| Defendant. | ) |

ENTERED
AUG 3 2000

## MEMORANDUM OPINION

This cause comes to be heard on defendant Women's Health Care Professionals, Inc.'s Motion to Dismiss, converted by the court to a Motion for Summary Judgment, filed May 9, 2000. In her complaint, plaintiff Nancy Barron claims defendant violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., by terminating her employment and failing to reassign her. Based upon the submissions of the parties and relevant statutory and case law, the court concludes that defendant's motion is due to be granted.

## BACKGROUND

Defendant Women's Health Care Professionals employed plaintiff Nancy Barron from 1977 until her termination on June 1, 1999. Prior to 1995, Barron held the position of medical records clerk, which required her to have direct contact with patients. In 1993, Barron was disciplined for spending too much time on phone calls and not answering the phones sufficiently. In 1991, Barron was disciplined for dispensing medical advice over the phone. However, Barron

1

contends that she had been doing that with the permission of the doctors for sixteen years and was not at fault for it. Barron was also disciplined for discussing her personal and sex life, and for discussing the effect of "being stoned" within earshot of patients in 1992. Barron denies this, and contends that she was discussing a patient's sex life from a medical standpoint outside of any patient's earshot. Barron contends she made the comment about "being stoned" only in regards to the side effect of a medication she was taking.

Because of these incidents, Barron was moved to a position which limited her contact with patients. Thus, in 1995, Barron was moved to the position of chart filing clerk by Carol Carlisle, the office administrator. At the time of the transfer, Barron had been having pain and limited movement in her left knee, and also suffered from dizziness and nausea caused by inner ear trouble that was a permanent result of a 1992 brain surgery. This new position required Barron to lift and carry from 600 to 1,000 files per day and spend 66% of her time either standing, stooping, squatting, or bending, to pick up or place files.

After several months working as a chart filing clerk, Barron's left knee began giving her more pain. As a result, Barron had surgery on her knee on May 16, 1996, and returned to work in June of 1996. In October of 1996, Dr. Douthit, Barron's physician, informed her that her left knee would never recover while she performed the duties of chart filing clerk. From the time she returned to work following her knee surgery, until January of 1998, Barron continued to work as a chart filing clerk, but continued to have more pain and limitation of motion in her left knee. During this time, Barron continued to receive medical treatment and therapy for her left knee which gave her some temporary relief. In January of 1998, Dr. William Haller diagnosed Barron with degenerative arthritis in both knees and shoulders. He also diagnosed Barron with bulging

2

intervertebral disks in her neck, causing her pain which was exacerbated by lifting charts at work. From January to May of 1998, Barron attempted therapy for these problems, but this attempt was unsuccessful in alleviating her pain and discomfort.

On May 13, 1998, Barron requested, in writing, that Carlisle transfer her into a new position because of her medical problems. The next day, on May 14, 1998, Barron met with Carlisle and Carrol Ellis, Barron's immediate supervisor, to discuss her request. Carlisle informed Barron at that meeting that there were no positions available at that time into which she could be transferred, and that no new positions would be created for her. However, Ellis and Carlisle informed Barron that they would gladly make "reasonable accommodations" for her. They also warned Barron to not use a stool because of her dizziness, and to ask for help whenever necessary. They all agreed that Barron's physician would forward a letter stating his medical opinion on Barron's ability to perform in other positions.

On June 1, 1998, Barron spoke with Dr. Haller. During this discussion, Dr. Haller informed Barron that she would never be able to go back to the position of chart filing clerk. However, Dr. Haller stated that he thought there was no reason why Barron could not work at a desk job which required minimal bending. During this discussion, Barron decided to have knee surgery, which was scheduled for and occurred on September 22, 1998. On June 11, 1998, Dr. Haller sent Carlisle a statement which stated that it would be beneficial to place Barron in a job which did not require lifting or squatting as both of those activities were detrimental to Barron's health. Prior to the surgery, Carlisle informed Barron that the defendant had hired someone temporarily to replace her.

In January of 1999, the position of telephone receptionist came open, but Barron was not

3

considered for the position. On January 18, 1999, Dr. Haller wrote Carlisle, informing her that Barron could probably perform in the telephone receptionist position, so long as she did not have to frequently bend and stoop in that position. The position did not require frequent bending or stooping. Barron did not receive the job.

In the spring of 1999, a position of mammography receptionist came open. However, Barron was not considered for this job even though, through the course of Barron's employment with the defendant, she had performed many of the duties of telephone receptionist, insurance clerk, appointment clerk, and mammography receptionist. Defendant contends that Barron was not considered for these positions because of her consistently inappropriate behavior around patients. Barron contends that she was never informed of this reason.

The defendant terminated Barron on June 1, 1999. Plaintiff received her Right-to-Sue letter from the EEOC on February 5, 2000. Plaintiff filed suit in this court on April 10, 2000, claiming violation of the ADA for failing to reassign her in a vacant position.

## DISCUSSION

### A. Standard of Review

Summary judgment may be granted based upon facts developed during the administrative proceedings, the pleadings, discovery, and supplemental affidavits if together, they show that there is no genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. Id. The non-moving party then bears the burden of showing that there are specific facts

4

demonstrating that there is a genuine issue of fact for trial. Id. at 324. "When deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." Korman v. HBC Florida, Inc., 182 F.3d 1291, 1293 (11th Cir. 1999). The trial court must resolve all reasonable doubts in favor of the non-moving party, but need not resolve all doubts in a similar fashion. Barnes v. Southwest Forest Indus., Inc., 814 F.2d 607, 609 (11th Cir. 1987).

### B. Analysis

Under the ADA, an employer may not discriminate against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, a plaintiff must show that (1) she is disabled; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of her disability. See Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000) (citing LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 835 (11th Cir. 1998). In this case, the parties dispute whether, under the ADA, Barron is disabled and/or a "qualified individual."

#### 1. Disability under the ADA

Plaintiff contends that her degenerative arthritis is a disability under the ADA as it substantially limits her major life activities of walking, standing, lifting, and working. Defendant only challenges Barron's claim that her disability substantially limits her major life activity of working.

Defendant argues that Barron is not disabled under the ADA, as the Eleventh Circuit has

5

interpreted that phrase. Defendant asserts that the Eleventh Circuit in <u>Reed v. Heil Co.</u>, 206 F.3d 1055 (11th Cir. 2000), held as a matter of law that lifting restrictions such as not being able to lift more than forty-five or fifty pounds do not qualify as a disability under the ADA.[1] Following this reasoning, defendant contends that plaintiff is not disabled because her restrictions are similarly slight. Furthermore, defendant asserts that there is no medical documentation that plaintiff was specifically restricted by her doctor to not lift or stoop, but only that she shouldn't do those activities frequently.[2]

Plaintiff argues that degenerative arthritis is recognized as a disability under the ADA, relying on <u>Coley v. Secretary of the Army</u>, 689 F. Supp. 519, 521 (D. Md. 1987). Plaintiff contends that the cases cited in <u>Reed</u> regarding lifting restrictions dealt with weight restrictions, rather than restricting lifting altogether. Plaintiff contends that the letters of Dr. Haller demonstrate that she suffered from chronic neck, shoulder, and knee pain. Plaintiff argues that defendant itself considered plaintiff unable to perform either a class of jobs or a broad range of

---

[1] Actually, the Eleventh Circuit specifically declined to rule on that issue as the plaintiff failed to establish that he was a "qualified individual." 206 F.3d at 1062.

[2] On June 11, 1998, Dr. Haller wrote to Carlisle that Barron "has chronic neck and shoulder pain and also has chronic knee pain.... I think it would help to modify her job. I think it would be beneficial for [her] to have a non-lifting job in a job that does not require her to squat. I think avoiding both these activities would be beneficial to her neck pain and to her knee pain."
On January 18, 1999, Dr. Haller wrote to Carlisle that Barron "could probably qualify for the job [of telephone receptionist]. The only thing that bothers me is the requirement to have to bend and stoop. I think this may bother her a little bit at this time to do something like that and, if her job required her to do that on a very frequent basis, could be a long-term problem for her. However, if she doesn't have to do that frequently, I think it's going to be worthwhile to let her try the job and see if she could perform it."
On April 16, 1999, Dr. Haller wrote a letter to whom it may concern that Barron's "condition should not interfere with her ability to work except for restricting her bending of the knees or stooping. This activity should be limited."

6

jobs in various classes as it informed her that she was not physically able to perform the receptionist positions without permission by her physician.

The ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more major life activities of an individual;
(B) a record of such impairment; or,
(C) being regarded as having such impairment.

42 U.S.C. § 12101(2). The Eleventh Circuit frequently consults the EEOC regulations in assessing whether a physical impairment substantially limits a major life activity. See Hilburn v. Murata Electronics North American, Inc., 181 F.3d 1220, 1226 (11th Cir. 1999) (citing Gordon v. E.L. Hamm & Assocs., Inc., 100 F.3d 907, 911 (11th Cir. 1996)). Under these regulations, the term "substantially limits" is defined as "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." Id. (citing 29 C.F.R. §§ 1630.2(j)(1)(i), (ii) (1997)). When considering whether an impairment substantially limits a major life activity, courts consider (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or expected permanent or long term impact, of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2) (1997). Major life activities are defined to include working. See 29 C.F.R. § 1630.2(i) (1997). Regarding the major life activity of working, the regulations expound that the term "substantially limits" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in

7

various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.R.F. § 1630.2(j)(3)(i) (1997).

In Cooley, a Maryland district court held that the plaintiff was a "handicapped person" under the Rehabilitation Act of 1973, where the plaintiff was diagnosed with osteoarthritis and his medical report limited him to not lifting or carrying over fifteen pounds. 689 F. Supp. 519. The court specifically found that the plaintiff's handicap was a significant barrier to his employment, a major life activity under the Rehabilitation Act. While this case does present some similar facts as to the case at bar, it comes from another circuit at the district court level, and was decided on the basis of a different statute thirteen years ago, limiting its value to this court.

In Reed, the Eleventh Circuit noted that a number of circuits have held as a matter of law that lifting restrictions of a certain level do not constitute a disability. 206 F.3d at 1061 (citing Thompson v. Holy Family Hosp., 121 F.3d 537, 539-40 (9th Cir.1997) (restriction from lifting more than fifty pounds twice per day and one hundred pounds once per day not a disability); Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346, 349 (4th Cir.1996) (twenty-five pound lifting restriction not a disability); Aucutt v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1319 (8th Cir.1996) (twenty-five pound lifting restriction not a disability); Ray v. Glidden Co., 85 F.3d 227, 228-29 (5th Cir.1996) (restriction allowing limited lifting of forty-four to fifty-six pounds not a disability)). However, the court noted that a district court in this circuit had disagreed with those cases, finding that a lifting restriction of no more than twenty-five pounds with limited bending and stooping did constitute a disability. Id. at 1062 (citing Frix v.

8

Florida Tile Indus., Inc., 970 F. Supp. 1027, 1034 (N.D. Ga. 1997)). The court further noted a Seventh Circuit case in which the court held that a genuine issue of fact existed as to whether the plaintiff was disabled where there were shoulder injury restrictions of no heavy lifting, overhead work, pulling, or pushing. Id. (citing Cochrum v. Old Ben Coal Co., 102 F.3d 908, 911 (7th Cir. 1996)). The court finally noted that the Interpretive Guidelines seem to support the view of the Seventh Circuit, citing 29 C.F.R. pt. 1630 app. at 351.[3] Id. From this, it appears that the Eleventh Circuit might be more inclined to agree with the reasoning of Frix and Cochrum than with the other four circuits which have weighed in on the issue. While this court is not required to be clairvoyant, it will cautiously keep in mind the language used by the Eleventh Circuit in Reed.

In Frix, a district court expressly rejected the reasoning in Williams, Aucutt, and Ray. 970 F. Supp. at 1034. Instead, the court relied on the language in 29 C.F.R. Pt. 1630, App. § 1630(j) (1996) (supra at n.4). The court found that the plaintiff's back impairments prevented him from performing a class of heavy labor jobs. The court noted that this was especially true because of plaintiff's inability to repetitively bend and stoop. In that case, the plaintiff's doctor permanently restricted the plaintiff from repetitive bending, twisting, crawling, or lifting more than 25 pounds. In this case, Barron's physician never specifically restricted these activities for the plaintiff, but merely cautioned against them and suggested their frequency be limited.

---

[3] 29 C.F.R. pt.. 1630 app. at 351 states:
[A]n individual who has a back condition that prevents the individual from performing any heavy labor job would be substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to perform a class of jobs.

9

In Mendoza v. Borden, Inc., 158 F.3d 1171, 1175 (11th Cir. 1998), the Eleventh Circuit held that the district court correctly granted summary judgment to the defendant where the plaintiff's only evidence produced to show her disability under the ADA was that she had an impairment which prevented her from lifting objects over five to seven pounds. The court, quoting Swain v. Hillsborough County School Bd., 146, F.3d 855, 858 (11th Cir. 1998), noted that the plaintiff failed to produce any evidence to show that she could not perform a broad range or class of jobs, but rather only made the vague assertion that she could not perform any job which required her to life more than seven pounds. The court found this limited evidence insufficient to prove a disability under the ADA.

In this case, Barron has presented evidence that she has problems with her knees, which no one disputes. In support of her claim, she has submitted letters written from her doctor which give rather qualified statements as to her working abilities. The resolution of this issue is far from clear. However, because the case can be decided on whether Barron is "qualified" for the positions sought, the court declines to resolve this difficult question.

### 2. "Qualified Individual"

Plaintiff contends that she identified at least five positions which became available between January and April of 1999 for which she was qualified. Plaintiff further contends that she specifically requested transfer/reassignment to two of these positions. Plaintiff argues that her previous work performance problems are unrelated to her ability to fill the positions. Plaintiff also asserts that the alleged instances of misconduct occurred over six years ago and are only an excuse invented by defendant to not place her into one of those positions, relying on Taylor v., Food World, Inc., 133 F.3d 1419 (11th Cir. 1998).

10

Defendant argues that for an adverse employment action to fall under the ADA, it must have been taken because of the employee's disability. Defendant contends that the record clearly shows that defendant had plenty of legitimate reasons for not placing plaintiff in the positions she sought. Defendant further contends that, contrary to plaintiff's assertions, the complaints regarding plaintiff's work performance do involve her qualifications for the subject positions. Furthermore, the reprimands plaintiff received on the job predate her alleged disability, removing any possible inference of improper motives on the part of defendant.

Determining whether an individual is "qualified" for a job is a two-step process. See Reed v. Heil Co., 206 F.3d 1055, 1062 (11th Cir. 2000) (citing 29 C.F.R. Pt. 1630 App. at 352-53). First, it must be determined whether the individual satisfies the prerequisites for the position; i.e., whether the person has sufficient experience and skills. See id. Second, it must be determined whether the individual can perform the essential functions of the job, either with or without reasonable accommodations. See id.; see also 42 U.S.C. § 12111(8). The "essential functions" are the fundamental job duties of a position which the disabled individual would actually be required to perform. See Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000) (citing 29 C.F.R. § 1630.2(n)(2)(1)). In determining which functions are actually essential, consideration should be given to the employer's judgment, and evidence of the essential functions may be gleaned from a written description of the job issued prior to advertising or interviewing applicants. See id. (citing 42 U.S.C. § 12111(8)). These two steps seem to discuss the same facts, at least in this case, and so will be discussed together.

Defendant has a printed job description for the position of telephone receptionist, revised April of 1998. It states the "essential duties" as:

11

- Answers all incoming telephone lines – making connections and relaying call appropriately and timely
- Supplies information to callers as appropriate
- Prioritizes calls and takes written messages as necessary...
- Operates system of intercoms to notify individuals of phone calls
- Operates pager system...
- Runs appointment schedule daily and calls patients to remind them of their next-day appointments
- Performs clerical duties as necessary
- Maintains accurate, up-to-date list of in-house extensions
- Practices patient and practice confidentiality according to practice guidelines

While it is undisputed that Barron at times filled the same or similar positions for defendant for limited periods of time, that fact does not necessarily mean that she was able to perform the essential duties in those positions. In fact, Barron was disciplined for being unable to adequately handle incoming phone calls from three phone lines.[4] Currently, defendant has fifteen incoming phone lines which Barron would be expected to handle if hired for the position. Defendant felt, based on its first hand experience with Barron in this position, that she was unable to perform the essential functions of the job. As her inability to perform adequately in this position did not stem from her disability and was not based on perceived disability, there is no discrimination.

Furthermore, an essential duty is to communicate appropriately with doctors and patients.

---

[4] From 1991 disciplinary report:
Formal discussion w/ Nancy Barron today Re: giving counseling and advice to patients beyond the realm of her expertise and knowledge. She has continued to handle medical and nursing questions, thus, leaving the remaining phone lines unanswered. I have discussed this same issue w/ Nancy, informally, a number of times but she has failed to follow through w/ the instructions and direction she has been given.... This formal reprimand it triggered by repeated patient complaints of delayed answering of our phone lines, audible conversations by Nancy w/ patients regarding their medical care and complaints by the three doctors that our phones are not being handled efficiently.

12

Barron has a long history of communicating inappropriately within earshot of patients.[5] Barron also has a long history of allegedly dispensing medical advice to patients although she is not trained or authorized to do so. It appears to this court that Barron, based on her own work experience with defendant, displayed her own inability to perform the essential duties of the positions she sought.

This case is distinguishable from <u>Taylor v. Food World</u>, relied on by Barron. In <u>Taylor</u>, the plaintiff was an autistic male in the position of utility clerk, which entailed sacking bags, cleaning, and assisting customers in getting groceries to their cars. Taylor allegedly asked patrons of the store questions, which some patrons may have found annoying or offensive. The Eleventh Circuit found a factual dispute preventing summary judgment on the issue of whether Taylor could perform his job without offending customers. The present case deals with a medical office, rather than a supermarket. Inherent within this difference is the common knowledge that a different level of appropriate behavior is required by the employees who deal with the public in such situations. It is entirely reasonable that Women's Health Care Professionals would require a higher level of sensitivity and tactfulness of its employees dealing

---

[5] From 1989 progress report: "Suggestions for improvement - needs to work on tactfulness when dealing w/ patients"
From 1993 notes:
1/19/93: Discussed w/ Nancy problems w/ her attitude and her actions in the front office. Explained to her she would be terminated if it continued. Discussed the used of foul and obscene language in front area w/in earshot of patients. Also, discussed Nancy's continual medical counseling and the necessity to cease immediately.
2/11/93: Continue to hear Nancy counseling pts. on the telephone
3/19/93: Nancy on phones - continues to talk to pts.
3/23/93: Problem w/ pt....

13

with its clients than would a grocery store. Furthermore, in Taylor's case, the record was unclear whether there had been complaints made against him by customers and whether the questions he asked customers were actually offensive or inappropriate. Here, Barron's tactlessness and inappropriate conversations are well documented.

Furthermore, as to the third prong of a prima facie case, it is abundantly clear to this court that defendant did not fail to transfer Barron into the positions she sought because of her disability, but rather because of her prior work record in similar positions. There is simply no evidence in the record that defendant discriminated against Barron based upon her disability. No reasonable jury could come to any other conclusion. Thus, Barron has failed to make out a prima facie case under the ADA.[6]

### C. Conclusion

Based on the foregoing, defendant's motion for summary judgment will be granted.

This 3rd day of August, 2000.

*[signature]*
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[6] The court declines to consider whether Barron's receipt of disability benefits judicially estops this action.